ANGEL BELTRÁN VEGA, Plaintiff and Appellee, v. LAUREANA ALMODÓVAR, Defendant and Appellant.

No. 8299.   Argued May 27, 1941.—Decided July 15, 1941.

*M. Bahamonde Ricomar* for appellant.   *Ramón A. Gadea Picó* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is an action to enforce a claim for support, brought by a husband against his wife, which was decided in favor of the plaintiff.

It was alleged in the complaint that the plaintiff and the defendant were married in Ponce about forty-three years ago, and that they lived under the same roof until the plaintiff, who suffered from paralysis of the right side, deserted her upon being assaulted by his wife with an iron pipe.

That due to his age—he is sixty four—and to his physical condition, he is unable to work and lives upon his friends' charity; that formerly he was janitor in the offices of the PRRA, at a monthly salary of $60, which position was given to his wife upon his becoming ill, on the understanding that the latter should keep up the home, and that the defendant neither takes care of him nor helps him.

That during their marriage two houses were bought; one of them is occupied by the defendant and the other is leased at a rental of five dollars per month which is collected by the defendant; and that the plaintiff owes thirty-nine dollars for food.

The defendant in her answer admitted that she was married to the plaintiff. She alleged that they lived together until the plaintiff deserted her and went to live with a concubine by the name of Rafaela Rodríguez, and that ten months ago her husband entrenched himself in the house and armed with a stick tried to prevent the defendant from entering, the defendant being compelled to defend herself. He brought charges against her and caused her to be arrested, but she was discharged by the court.

It is admitted by the defendant that plaintiff suffers from paralysis of the right side but she alleged that he is left-handed and it was with the left arm that he tried to strike her, and she further alleged that it was not true that plaintiff was living on the public charity but was supported by his concubine and that it was not true that he had resigned

his position on account of illness or that his position had been given to his wife on the understanding that she would support him. That the defendant worked in the offices of the PRRA with other people, and that she was paid by the hour and had to support herself and a foster daughter with her earnings.

Lastly she alleged that her husband sold for sixty dollars his share in the two houses owned by them, that there was no other property belonging to the conjugal partnership, and that she did not know of her own knowledge whether the plaintiff had contracted his alleged debt.

After the evidence was heard, the trial court expressed itself as follows:

"It is to be noticed that the defendant testified that she only defended herself against the attack made with a stick, by her husband, and that it was with the left arm that her husband attempted to give her a thrashing.

"Therefore, it was not denied by the defendant that she had stricken the plaintiff. She seeks to excuse herself by stating that she only defended herself when the plaintiff entrenched himself in her home. He who entrenches himself does so in order to shield himself from attack. The incapacity and defenselessness of a paralytic compels him to defend himself in that way.

"It is not probable that a man suffering from paralysis of the right side, feeble, old, and under medical treatment, should provoke a fight with a woman younger than he and who is filling a position formerly held by him, with the knowledge that if she fought back he was going to find himself quite defenseless.

"The defendant alleged that the plaintiff deserted the home and went to live with a concubine.

"The plaintiff, on the contrary, testified that he left his home and went to live with a brother; that one day he met an old friend who, from gratitude to him for past favors and upon seeing how sick and poor he was, invited him to go and live in her home, where he now lives and is the recipient of the little help she can afford.

"On this important particular the testimony of the defendant was not corroborated by any witness. If we take into account the old age of the plaintiff and his ruinous physical condition, we can

not conceive the relation of concubinage between the plaintiff and a young woman according to the description furnished by the defendant.

"From her manner of testifying and her attitude while on the stand, the court can not give credence to the testimony of the defendant.

"The defendant testified while on the stand that if plaintiff returned to their home she will supply all his needs according to her financial and social condition.

"It is the opinion of the court that the plaintiff acted legally and legitimately in leaving the home, for the law not only justifies the separation but it also establishes as a ground for divorce cruelty and grave injuries.

"In the opinion of the court the plaintiff acted in self-protection against hunger, lack of shelter, and destitution when he accepted the aid of the friend in whose home he lives, and we can not presume, in the absence of proof, that there was any immorality or delinquency in his conduct as alleged by the defendant."

It concluded by saying:

"As the plaintiff has been compelled to desert the home because of the physical punishment to which he was subjected by his wife, it is our opinion that the plaintiff is entitled to refuse to return to his wife's home to be supported by her, according to the holdings of our Supreme Court in *Moll* v. *Llompart*, 17 P.R.R. 666, and *Maeso* v. *Ortiz*, 44 P.R.R. 155.

"Having weighed the evidence as a whole, the court finds for the plaintiff herein and, therefore, adjudges defendant, Laureana Almodóvar, to pay to the plaintiff, Angel Beltrán Vega, $20 monthly for support, the payment thereof to begin as from April 18, 1940, when the complaint was filed in the above entitled case, in accordance with the provisions of Section 147 of the Civil Code, 1930 ed., and the defendant shall pay the said allowance to the plaintiff monthly in advance; and she is warned that she will be prosecuted for contempt in case of failure to comply with the judgment rendered in this case, with costs excluding attorney's fees."

As grounds for her appeal from the above judgment the defendant assigns four errors, to wit:

"1.— . . . grave error of law in failing to hold that the proven fact that plaintiff has been living with Rafaela Rodríguez as his

concubine during many years relieves the defendant from her obligation to support him so long as the plaintiff and appellee continues living with her.

"2.— . . . manifest error in weighing the evidence, being moved by passion and prejudice.

"3.— . . . manifest error in compelling the defendant to pay to the plaintiff and appellee $20 monthly out of her salary of $24 semi-monthly which she earns for the support of herself and of others who help her, such allowance being excessive.

"4.— . . . erred in refusing to reconsider the judgment."

We will consider first the second assignment of error.

It is difficult, indeed, for an appellate court, after the trial court has stated that no credence can be given to a witness, to decide otherwise, as it is unquestionable that the court which sees and hears a witness testify is in a better position to determine the truth of the testimony than the court which merely reads it.

However, our examination of the record has impressed our mind in such way that we can not but express serious doubts as to whether the trial court was right in concluding that the testimony of the defendant was not worthy of credit.

Almost every statement made by her was corroborated. For instance, she said that her husband was living with a concubine and the husband himself at the trial admitted that to be true. She asserted that she was earning twenty-five cents per hour of work, sometimes twenty dollars semi-monthly, sometimes twenty two, and sometimes nineteen dollars and fifty cents, and her evidence is corroborated by documentary evidence. She stated that even from such sum she had to deduct what she paid for help, and her statement was corroborated by the rest of the evidence. It is true that in her testimony she tried to shift on her husband the blame for the assault and there is a witness who testified to having seen her strike her husband with a piece of wire; but it is also a fact that she was exonerated of that charge when

tried before the municipal court, and that she maintains that she only acted in self-defense.

The testimony of the husband, on the contrary, is remarkable for its exaggeration in describing his condition and the several assaults of which he was the victim, he portraying himself as blameless in all of the situations; and his statements relating to the amount of the salary of his wife, to the instrument with which she had attacked him, and to the small houses jointly owned by them, contained in his verified complaint, were destroyed by the evidence.

Let us now consider jointly the first and third errors assigned and we will then close our discussion, because the fourth assignment deals with the same questions covered by the first three assignments.

That part of the testimony of the defendant during the trial which brings out the actual facts of the case and which clearly shows her attitude, reads as follows:

"Is he now living at home?—He is living at the house of his concubine with whom he had been living for the last twenty years. That is why we are estranged, on account of that woman, it is because of that Rafaela Rodríguez that he has made me suffer so much, and I am not going to work to supply him with money with which to support that woman. I have no children, and I suppose that in the courts the party who claims support is the wife from her husband and not the husband from his wife. I would help him if he lived by himself.

"Atty. Bahamonde: You would have no objection to helping him?—I would not if he were alone, but I would give her nothing. What, give him money that he can pass on to that woman?

"You are not willing to work so as to give money to his concubine?—I would rather quit the job. What, get up at four o'clock in the morning together with this child who is my niece, while they stay in bed and I working? Don't kid me! The judge is the knife and I am the meat!

"Judge: Do not make any comments. There is no judge of that type here. Here justice is meted out to everybody.—Witness: I am already pretty old . . . .—Judge: The court's business is a serious matter and the court knows what it means—Witness: I am

already old . . . .—Judge: The court will not allow any further explanations. The Spanish language is quite clear.—Witness: What I mean is . . .—Judge: Enough. We can not discuss that any further. Witness, please proceed with your testimony.

"Atty. Bahamonde: Let her apologize.—Witness: One can not be punished . . .—Atty. Bahamonde: For God's sake, stop talking. Do you object to supporting him?—Witness: If he were alone I would not object, but I do while he is living with that woman. Even more, after buying the home supplies I used to give him $5 when he was at home.

"Did he leave the home?—He did.

"Where does he live? Where does he live at present?—In San Juan Alley.

"With whom?—With that woman Rafaela.

"Is that Rafaela related to him?—His concubine.

"That is all.

"Atty. Gadea: Tell me, madam, did you state that that lady has been the concubine of your husband for the last twenty years?—I say so because I am his wife, and I can tell about the time."

The following are typical excerpts taken from the testimony of the plaintiff:

"After leaving the Tricoche hospital, what happened between you and your wife?—One day I got home about half past five o'clock in the afternoon and she slapped my face four times, I was trembling, and threw me rolling to the ground. I pulled my hair and started crying, and got away slowly and went to the Milagrosa to my brother Juan's home, where I arrived at about eight o'clock at night. I could scarcely walk.

"After that, what else happened?—After arriving I threw myself down, and long after that, three months, in the month of June, one day, being barefooted, I went to her.

"You had left the home?—Yes, Sir.

"And where were you living?—At my brother Juan's home.

"*       *       *       *       *       *       *

"What is your occupation?—Begging from my friends in town, secretly because I am afraid of being caught and put in jail.

"Do you live on your friends' charity?—Yes, sir. They give me quarters and dimes. Some days I get nothing and have to go to bed that way.

"  *        *        *        *        *        *        *

"Have you gone to her and begged her to give you something?—Yes, and she gave me a beating, and after she beat me, I would be courting death if I went.

"  *        *        *        *        *        *        *

"Atty. Bahamonde: Tell me, Beltrán, can you not work as a watchman?—I can work as a watchman but nobody will take me.

"Judge: The court wishes to state that in getting to the witness stand the witness could hardly walk owing to his paralytic condition. This is for the purpose of the record.

"  *        *        *        *        *        *        *

"You state that without any previous provocation she struck you with an iron pipe?—She was arrested for that.

"Judge: Did she strike you with an iron pipe—No, it was with a whip made up of electric wires. Three wires bound together.

"Then, it was not with an iron pipe?—It was not with an iron pipe, it was with an electric wire, those cords.

"Atty. Bahamonde: When that happened, were you living apart with her or were you living together?—Did I not tell you that it was forty days after leaving the Tricoche hospital that she first slapped me, four times?

"My question is whether when that took place you were living with her?—I was not living with her.

"You went then to her?—I went one day, as I was barefooted and went and told her to give me sixty cents to buy a pair of tennis shoes.

And you say that both were acquitted?—Yes, sir.—Was she acquitted?—Yes, sir. I suppose she was acquitted because of some kind of fixing.

"  *        *        *        *        *        *        *

"You say that you were living with a brother?—I was living with a brother.—And with whom are you living now?—I am leaving in San Juan Alley because I was homeless, and I had met a woman to whom I had done some favors, and who said: 'this man should not be homeless', and she took me to her home and has taken this burden upon her. Yet, my wife has not thought of me, of helping me or giving me anything. What she wanted was that I should die on the street, or that I might be caught begging by the police and taken to jail.

"The fact is that you are living now with a concubine?—Yes, sir.

"Have you always lived with her?—No, sir.

"  *        *        *        *        *        *        *

"Atty. Bahamonde: You must tell the truth. How long have you known her, lived with her?—Witness: I tell you that I lived with her and left her, and about six months ago I went to her. During that time I was living with my brother Juan."

Is it fair, under such circumstances, that a decision should be rendered ordering an aged wife, who has to support herself exclusively on forty dollars a month which she earns by her work, to pay half of that sum to a husband who lives with a woman who has been his concubine, which connection was the cause of constant quarrels in the past, even though it be proven that the wife maltreated her husband, it being also shown that during the trial the wife repeatedly stated that she was willing to help her husband, provided he severed said connection? Not by any means, in our judgment.

It is true that the law provides that the spouses are bound to support each other. Section 143 of the Civil Code, 1930 ed. It is also true that this court, in construing and applying the provision contained in Section 148 of the Civil Code to the effect that "the person obliged to render support may, if he so elects, either pay the amount required to be paid or receive and maintain in his own dwelling the person having a right to such support," said in the case of *Moll* v. *Llompart,* 17 P.R.R. 666, that "The right of option which section 218 of the Revised Civil Code allows is not absolute nor inflexible, and the offer of the husband to support his wife in his own home may be refused when the acceptance thereof is barred by legal, moral, or social motives, or when a reasonable and justifiable cause for declining said offer exists"; and it confirmed that doctrine in the cases of *Maeso* v. *Ortiz,* 44 P.R.R. 155, and *Padovani* v. *Irizarry,* 53 P.R.R. 597. But the situation herein is different from that presented by those cases.

In *Girod* v. *District Court,* 43 P.R.R. 164, 166, this court said that in applying the law to cases of this nature it seemed reasonable that account should be taken of "life as it really is and the attendant events," and applied the doctrine which was laid down in the first of the introductory recitals (*considerandos*) of the judgment of the Supreme Court of Spain of October 16, 1903, thus: "Whereas, one of the most essential duties imposed by law on the spouses is the mutual support whenever such support becomes necessary, irrespective of the legal status of the marriage, *unless the necessities of either spouse arise from acts committed by such spouse which place him or her in a situation at variance with the law.*" (Italics ours.) *96 Jurisprudencia Civil* 375.

The real situation in the instant case is that husband and wife were separated in fact although not legally. It might be argued that the separation was perhaps due at first to the ill-treatment of the husband at the hands of the wife; but the conduct of the husband who went to live with his concubine bars his claim, since the wife repeatedly stated at the trial that she was willing to support her husband but not while living with his concubine. We fail to see why the husband should not be able to return to his wife, provided he conducts himself decently.

We admit that a legal separation of the spouses is not required as a condition precedent to a claim for support. However, in order that a separation in fact may serve as a basis for such claim it is necessary that the spouse from whom recovery is sought be the guilty party and that the claimant's present conduct should justify the claim.

The judgment appealed from must be reversed and another rendered instead dismissing the complaint, with costs.